looking for a seat but she saw it when her foot struck it and she looked towards the floor of the car.

The judgment is affirmed.

---

# Colket *v.* Verner, Appellant.

*Waters—Rights of upper riparian owner—Damming stream— Equity.*

1. As against a lower riparian owner, the owner of the lands higher up the stream has the right to have the waters of the stream flow over the lands as they would naturally flow. The lower owner has no right to obstruct the flow of the stream by a dam so as to flood the land of the upper owner, or to raise the level of the water in its bed to his detriment.

2. Equity will relieve against the obstruction of a stream by the owner of lower land to the injury of the owner of upper land bordering upon it.

3. Where the trustee of an estate permits a person to occupy land until sold, and such person makes no objection to the backing up of water upon the land because of a dam constructed by a lower riparian owner, and the trustees have no knowledge of the construction of the dam, a purchaser of the land from the trustees has the right to maintain a bill in equity to enjoin the flooding of his land, notwithstanding the acquiescence of the former occupant.

4. An upper riparian owner may maintain a bill in equity against a lower riparian owner to restrain the maintenance of a dam which was flooding his lands, although he may at one time have polluted the stream with oil and gasoline from his garage, if it appears that as soon as he learned of such pollution he resorted to measures which completely abated the nuisance. The rules that he who would have equity must do equity, and that he who comes into equity must come with clean hands, do not apply to such a case.

Argued March 27, 1912.    Appeal, No. 85, Jan. T., 1912, by defendants, from decree of C. P. No. 4, Phila. Co., June T., 1909, No. 1554, on bill in equity in case of Tristram C. Colket v. Harry J. Verner, et al.    Before

FELL, C. J., MESTREZAT, POTTER, STEWART and MOSCH-ZISKER, JJ. Affirmed.

Bill in equity for an injunction.

AUDENRIED, J., filed the following opinion.

Tristram C. Colket, the plaintiff, owns a tract of land which adjoins another tract of land owned by Elizabeth K. Verner, one of the defendants. He alleges, by his bill as amended, that the defendants have within the boundaries of Mrs. Verner's land erected a dam in the bed of a small stream that flows through both of these properties, and that by reason thereof the water of the stream has been backed over his land to his damage and injury; and he prays that they be restrained from causing the water of the stream to overflow his ground, and from interfering with his use and enjoyment of his property.

The defendants admit the building of the dam complained of, but deny that it has increased the water in the stream upon the plaintiff's property, and that they have done damage or injury to the plaintiff.

Upon the evidence the trial judge finds the facts of the case to be as follows:

### FINDINGS OF FACT.

1. The plaintiff, Tristram C. Colket, is the owner of about five acres of land in Lower Merion township Montgomery county, Pennsylvania, situate on the northeast side of Morris avenue, near Bryn Mawr. This property was conveyed to him by Frederick A. Dreer, et al., trustees under the will of Ferdinand J. Dreer, his deed bearing date 26th May, 1905. On the land thus acquired Mr. Colket has built a house, in which he resides with his family, consisting of his wife and several small children. At a point about thirty feet from his southeastern boundary he has constructed and maintains an ornamental pond.

2. The defendant, Elizabeth K. Verner, is the owner

of about six and two-thirds acres of land situate on the northeast side: of Morris avenue, to the southeast of the plaintiff's land which it adjoins. This property was conveyed to her on 27th April, 1904, by her husband, the defendant, Harry J. Verner, who acquired title to it by deed dated 17th September, 1898, from Edward F. Beale et ux. Upon this tract a house has been built, which at the time of the filing of the bill was occupied by the defendants as a residence. The defendants have constructed and maintain a fish pond on the northwest side of their property, at no great distance from the plaintiff's land.

3. Mrs. Verner's land lies lower than that of the plaintiff. A small brook which rises in the lawn of Mr. Wayne MacVeagh and flows into Mill Creek, runs in a southerly direction across both properties, passing first through the Colket tract. By this stream, whose natural bed in few places exceeded eighteen inches in width, and whose depth was rarely greater than three inches, both of the ponds above referred to are supplied with water. The plaintiff's pond was constructed by widening and slightly deepening the original bed of the stream and throwing a dam across it. The defendants' pond was constructed by making an excavation in the earth to the east of the stream, from which the water necessary to fill and replenish it is conveyed to it by means of an underground pipe. This pond was constructed in 1904 or 1905.

[4. In order to raise the level of the stream to a height sufficient to make it possible to draw from it a supply of water for their pond, the defendants have built a dam across the brook at a point about thirty-five feet southeast of the plaintiff's line. The effect of this has been to back up the water over the plaintiff's land as far as the dam maintained by him, and to increase the depth of that portion of the stream between his dam and the fence that separates the two properties about twenty-two inches. The result of this deepening

of the water has been to make the stream overflow the bed that it originally occupied, and fill the entire space between the two sides of the gully through which it formerly meandered, so that now between the party line and Mr. Colket's dam the stream is from ten to twelve feet wide and a little more than two feet deep.] .

[5. The raising of the level of the stream to the southward of the plaintiff's dam has made it impossible for him to empty his pond and clean it out, because the surface of the water below the dam is much higher than the bottom of the pond.

During the Summer season a scum, consisting of a fungus or vegetable growth of some kind, appears on the surface of the water, backed up below the plaintiff's dam. Its presence at this point is due to the defendants' interference with the natural flow of the water. The scum, so-called, emits a disagreeable, sickly odor.

The steepness of the banks that confine the water that the defendants have backed up over the plaintiff's land, in conjunction with the present depth of the stream, renders the space between the plaintiff's dam and the defendants' land a place of danger for small children.]

6. In the year 1898 the defendant, Harry J. Verner, built a dam across the stream near the point where the dam of which the plaintiff complains now stands. This was not as high as the present dam, and did not back up the water of the stream over what is now the plaintiff's land. Into the pond thus formed large quantities of earth, &c., were brought down from the lands higher up the stream whenever freshets occurred. On a number of occasions, in order to maintain his pond, Mr. Verner was obliged to clean it out and cart away the earth removed from it. After this had continued for several years he caused a stone wall to be built across the stream at his boundary line in order to catch and hold the earth and debris brought down by the water, and thus prevented the filling up of the pond. The wall was of riprap—that is, it was made of stones laid

without mortar or cement. This structure was several times washed away, but was rebuilt each time in the same manner. The flow of the water was not interfered with by the riprap just mentioned.

7. Later, in 1904 or 1905, when the defendants' present pond was constructed, their original dam, the dam built by Mr. Verner in 1898, was abandoned, and the riprap work at the point where the stream crossed their boundary line was replaced by a concrete wall. This held back the water, and, to a certain extent, flooded the land above it. From the water thus dammed up the Verners drew the supply for their new pond by means of a pipe. These arrangements were made a short time prior to the purchase by Mr. Colket of the adjoining property. The land now owned by the plaintiff was then part of a tract occupied by a family named Schalliol, who, upon condition that they would keep the buildings and fences in repair and pay the insurance premium and the taxes upon it, had the right, under the will of their uncle, Ferdinand J. Dreer, its former owner, to live upon it rent free until it should be sold by the trustees, who were by Mr. Dreer's will vested with the power to dispose of it. To the backing up of the water by the defendants over the land that they occupied the Schalliols made no objection, but it does not appear that either they or the trustees under Ferdinand J. Dreer's will ever formally consented thereto.

[8. After the plaintiff acquired title to the land formerly occupied by the Schalliols, he protested to Mr. Verner against the backing up of the water of the stream over his property by the dam maintained on the boundary by the defendants. Negotiations ensued, which ended in the plaintiff's giving consent that this dam should remain until he called for its removal. The terms of the arrangement entered into between the parties are set out in a memorandum signed by Mr. Verner. This reads as follows:

"December 22, 1905.

"In view of the fact that Tristram C. Colket has permitted me to retain a dam backing the water on his property adjoining me at Bryn Mawr, I agree at his request, to remove the said dam within thirty days. I also agree to allow him to remove the plug in my dam in order to empty the water out of his dam.

"H. J. VERNER."

In making this agreement Mr. Verner undoubtedly intended to act for his wife as owner of the land involved, and Mrs. Verner has ratified and confirmed all that he did in the matter.]

9. About September 1st, 1908, the plaintiff, acting under the agreement of December 22d, 1905, notified the defendants of his desire that they should remove the dam maintained at the boundary line. With this request they complied, and that dam was demolished. All that remains of it are the wings, which, extending into the banks of the stream, were permitted to remain in order to support them. They in no wise interfered with the flow of the water. After several attempts by the defendants to obtain a supply of water for their pond through pipes either from the bed of the brook or from the plaintiff's pond had failed, in order to provide such water supply they built the dam of which the plaintiff now complains.

[This is situated about thirty-five feet from the boundary line. It is higher than the concrete wall that was torn down, and it has backed up the water on the plaintiff's land to a greater depth than that did.]

10. At one time in the Summer of 1908 the refuse gasoline and oil from the plaintiff's automobile garage escaped into the stream and so polluted the water that five hundred and fifty of the defendants' fish died by reason thereof. There is no evidence to indicate the value of these fish, if they had a value. No claim has been made by the defendants on the plaintiff for com-

pensation for this loss; but immediately that the plaintiff was informed that his men were polluting the stream, he constructed a "French drain" to receive the obnoxious matter, and has thus prevented further trouble from this source.

11. Whenever the plaintiff empties his pond the flow of water in the stream below the dam is checked when the dam is closed again until the pond is completely filled. It is not shown that the flow of the water was in this way stopped with undue frequency, and its stoppage for this purpose is not unreasonable.

The law applicable to these facts is as follows:

### FINDINGS OF LAW.

1. Aqua curret et debet currere ut usquam.

2. As against a lower riparian owner, the owner of the lands higher up the stream has the right to have the waters of the stream flow over his lands as they would naturally flow. The lower owner has no right to obstruct the flow of the stream by a dam so as to flood the land of the upper owner, or to raise the level of the water in its bed to his detriment: M'Calmont v. Whitaker, 3 Rawle 84; Bell v. M'Clintock, 9 Watts 119; Keller v. Stoltz, 71 Pa. 356; Knoll v. Light, 76 Pa. 268. Such a right, however, may be acquired by the owner of the lower land under grant from the owner of the land above him, or by prescription.

[3. The defendants have shown no grant from the plaintiff or his predecessors in title, that authorizes them to back up the waters of the stream over the land adjoining theirs to the northwest.

The failure of the Schalliols to object when the concrete wall constructed at their boundary line threw the water back over the land that they occupied was not a grant. Even so far as they were concerned, and under that view of their conduct most favorable to the defendants, the silence of the Schalliols amounted to nothing more than a license, which might at any time

have been revoked. The Schalliols, moreover, had no power to convey the land that they occupied, or grant any rights in it to endure beyond the time when it should be sold by the trustees of Ferdinand J. Dreer. The sale of the property by the latter divested it of all encumbrances, estates or interests created by the act of the cestui que trustent, and passed the title of the land to the purchaser in the same condition in which it was when Mr. Dreer died, except so far as it may have been changed by act of the trustees themselves. It is not pretended that Dreer's trustees knew anything about the damming back of the water of the stream by the defendants, and no question of the ratification by them of the giving of the license by the Schalliols so to do can possibly arise.

The agreement between Mr. Colket and Mr. Verner on December 22d, 1905, amounted to nothing but a license by Mr. Colket, which, under its express terms, might be revoked on thirty days' notice to Mr. Verner.]

4. The defendants have acquired by prescription no right to flood the plaintiff's land. Mr. Verner first constructed a dam in 1898, eleven years only prior to the filing of the bill; and the dam then constructed caused no overflow of the water on the plaintiff's property. It was not until 1904 or 1905, when the concrete wall was built on the boundary line, that the water of the stream was first backed upon the land now belonging to Mr. Colket.

[5. The backing of the water of the stream upon the plaintiff's land by the dam last constructed by the defendants constitutes an invasion of the plaintiff's rights.]

6. Equity will relieve against the obstruction of a stream by the owner of lower land to the injury of the owner of upper land bordering upon it: Beech v. Kuder, 15 Pa. Superior Ct. 89.

[7. Neither the principle that he who would have equity must do equity, nor the rule that he who comes

into equity must come with clean hands, stands in the way of granting the plaintiff's prayer for relief. It has not been shown that his own interference with the flow of the stream is unreasonable; and it appears that as soon as he learned that the oil and gasoline from his garage were polluting its waters he at once resorted to measures which completely abated that nuisance. For compensation for the loss of their fish caused by the oil and gasoline that got into the water the defendants have made no claim on Mr. Colket.]

8. The plaintiff is entitled to a decree enjoining the defendants, and all claiming under them, from maintaining in the stream flowing through their land any dam or other obstruction of such height as to back up the waters thereof and cause them to overflow his adjoining land, and further enjoining the defendants from preventing the free and natural flow of water down said stream from and off of his land. The costs of the cause should be paid by the defendants.

*Error assigned* was decree warding injunction.

*Samuel H. Kirkpatrick,* with him *Joseph G. Lester,* for appellants: Rerick v. Kern, 14 S. & R. 267; Swartz v. Swartz, 4 Pa. 353; Big Mountain Improvement Co.'s App., 54 Pa. 361; McKellip v. McIlhenny, 4 Watts 317; Campbell v. McCoy, 31 Pa. 263; LeFevre v. LeFevre, 4 S. & R. 241; M'Calmont v. Whitaker, 3 Rawle 84; Brown v. Bush, 45 Pa. 61.

*Hepburn, Carr & Krauss,* for appellee.

PER CURIAM, April 29, 1912:

The decree is affirmed at the cost of the appellant on the findings of fact and law by the learned judge of the Common Pleas.